BISHOP *v.* BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN.

1. INSURANCE—BENEFICIAL ASSOCIATIONS—FINAL DECISION.

A voluntary beneficial society may set up a tribunal to adjust the differences that arise between the association and its members, and make its decision final in the absence of bad faith or a refusal to act or to pay after an adjudication has taken place.[1]

2. SAME—REJECTION OF CLAIM BY MEDICAL EXAMINER—APPEAL.

Although the constitution of a fraternal beneficial association provided that the medical examiner should be the sole judge as to whether a member was disabled, and that payment of disability claim should be made only when approved by him, where it also gave both the board of directors and the convention of the order full power to allow the claim in full or reject it, in case the claimant took the prescribed appeal, rejection of a claim by the medical examiner was not final and conclusive.

3. SAME—LIMITATION OF ACTIONS—FINAL REJECTION.

An action begun within six months of the rejection of plaintiff's claim by the convention of the order was within the time limit of the constitution providing that claims should be barred unless the action was commenced "within six months after final rejection of the same."

4. SAME—EVIDENCE—SUFFICIENCY.

Evidence examined, and *held*, sufficient to sustain the finding of the jury that plaintiff was permanently disabled.

5. SAME—EVIDENCE—PERMANENT DISABILITY.

Where it was plaintiff's claim that he was permanently disabled at the time of his application to the order for compensation, testimony as to his condition at the time of the trial was admissible, since his condition if permanent was necessarily continuing.

Error to Saginaw; Kendrick, J. Submitted October 23, 1918. (Docket No. 5.) Decided April 3, 1919.

Assumpsit by Joseph A. Bishop against the Broth-

[1]See notes in 49 L. R. A. 353; 2 L. R. A. (N. S.) 672; 8 L. R. A. (N. S.) 917.

erhood of Locomotive Firemen & Enginemen for the amount of a benefit certificate. Judgment for plaintiff. Defendant brings error. Affirmed.

*Humphrey, Grant & Henry,* for appellant.

*Naegely & Picard* (*Purcell & Travers,* of counsel), for appellee.

STEERE, J. Plaintiff brought this action to recover, on the ground of total incapacity to labor, the amount of a beneficiary certificate issued to him by defendant, which is a fraternal beneficiary society or association operating upon the assessment plan, having a central and grand lodge with numerous subordinate lodges. Plaintiff had been in the employ of the Pere Marquette Railroad Company for many years as fireman and engineer and a member of defendant association since August 4, 1908, with a beneficiary certificate in the amount of $1,500 issued to him as provided in the constitution of the Brotherhood and in force from the time he became a member until this case was tried. When the events took place which gave rise to this suit he was in the neighborhood of 50 years of age, a married man with a family, residing in Saginaw, Mich., where he had for the preceding 17 years been employed as engineman in the yards of the Pere Marquette Railroad Company. On December 12, 1913, while engaged in yard service at switching or making up trains with his engine he found its brakebeam down and got under the engine to fix it and was in a kneeling position leaning over the front axle of the tank to put a bolt in to hold the brakebeam off the rail. While in that position between the tank and engine, another engine came to couple on to his, shoving it ahead and wheeling him around upon his back, the brakelever catching his clothing and dragging him a considerable distance with his back along the ties, severely

injuring him. He was first taken to the hospital on a stretcher, attended by a Dr. Wilson, and at the expiration of about four weeks removed to his home on a stretcher where he remained confined to his bed for some time longer before he was able to sit up. He states his then and subsequent condition as follows:

"I could not handle my legs at all; I got hold of a chair and stood there holding onto it. I could not get up without holding my hands onto the chair. I guess I was out of bed three weeks before I tried to go down stairs and my brother-in-law tried to carry me down on account of my inability to walk. During this time Dr. J. M. Wilson treated me. I had both crutches for a while round the house and out on the porch, then I tried with a crutch and a cane and then I tried to walk without a crutch with a cane but I could not manage it. I walked with a crutch and a cane for a long time, but I tried a little every day. My difficulty didn't seem to improve. It just seemed I could move my limbs a little better but not much. I have had pain in the base of my spine and back of my neck, shooting pains from my neck to the base of my spine. I have the same pains up to the present time. I saw specialists, experts upon nervous troubles. I consulted a specialist in Detroit and also in Ann Arbor, Dr. Washburn of Ann Arbor and Dr. Inglis of Detroit. * * * I went to them on account of their learning. They referred me to Dr. McGregor of Saginaw. I have been examined by two Drs. Wilson, Dr. Sample and other physicians."

On May 15, 1915, he made application to defendant through the proper channels to be paid the amount of his beneficiary certificate on account of permanent paralysis of the lower limbs under a provision in defendant's constitution, in part as follows:

"(*a*) A beneficiary member in good standing upon the books of the grand lodge becoming (1) totally and permanently blind in one or both eyes * * * or who may become totally and permanently disabled or incapacitated from performing all manual labor on account of (2) Bright's disease of the kidneys; (3)

permanent paralysis of either extremity, etc., * * * shall be entitled to the amount of his beneficiary certificate."

His application was in regular form, accompanied by the proper affidavits and certificates, etc., from his local lodge and when received was referred to the general medical examiner under a provision of defendant's constitution that in such cases:

"(f) All papers in a claim shall be referred to the general medical examiner, who shall, as soon as convenient, go to the place where the applicant is located, or he may have the applicant come to a more convenient place for examination."

Dr. W. B. Cory, defendant's general medical examiner, notified plaintiff by telegram to meet him at Jackson, Mich., on June 26, 1915, for the purpose of such examination, pursuant to which plaintiff presented himself at the appointed time and place and an examination was had during which a very unbrotherly feeling developed between them. Plaintiff testified that he was harshly treated and insulted by Dr. Cory, who in his rough method of examination hurt him severely, at the same time swore at him, accused him of faking and being under the influence of intoxicating liquor, which plaintiff denied and resented. The examination evidently resulted in friction and hard feeling between the parties, as to the cause and details, of which their testimony is somewhat in conflict. Dr. Cory, who was the only medical witness called by defendant, testified that plaintiff had a "dramatic neurosis, something the gold cure will help," admitted he swore on that occasion but claimed it was not at plaintiff, testifying on cross-examination in part as follows:

"Q. You told him that he was a faker?
"A. In my opinion. I told him that he was a simulator of an exaggerated type. During the course of the examination I swore, but not at him.

"*Q.* If you did not swear at him who did you swear at?

"*A.* If you want the instance I will tell you; I didn't swear at anybody.

"*Q.* Did you swear for pastime?

"*A.* I swore because I believed that Bishop was not acting fairly; I swore to get results; I was not getting results I was going after, and I swore and I got the results. I did not want to intimidate Bishop.

"*Q.* Do you think profanity helps the doctor in making an examination?

"*A.* It did in this case, that is the reason I swore. I told him down at the depot, after he tried to start an altercation, after he threatened to take the case to the local lodge, to the board of directors, to the president, and to the convention, that I didn't care a damn where he took it."

He also testified that he had practiced medicine six years previous to becoming defendant's general medical examiner, that he did all the examining for this order which had a membership of in the neighborhood of a hundred thousand and on the day in question had a number of other examinations which he had assembled at Jackson which kept him busy from 7:30 in the morning until 5 o'clock when he went to the depot to take the train.

On June 28, 1915, he made his report to the defendant's general secretary and treasurer at Peoria, Ill., stating he had examined applicant at Jackson, Mich., on June 26, concluding:

"The physical examination discloses that Brother Joseph A. Bishop is not afflicted with paralysis as contemplated by our laws, and therefore, in accordance with the provisions of section 7 of article 5 of the constitution, I recommend the rejection of this claim."

Section 7, article 5, of defendant's constitution of 1914 provides in part as follows:

"(*f*) He (the medical examiner) shall be the sole

204—Mich.—39.

judge as to whether or not a member is disabled in such manner as to be entitled to the amount of his certificate, in accordance with the constitution and by-laws, and payment of the disability claim will be made only when approved by the general medical examiner."

Upon rejection of plaintiff's claim by the general medical examiner and receipt of his report by the general secretary and treasurer, it was in due course of proceedings referred by the general secretary to defendant's board of directors for consideration of that body as their constitution requires, and the records of the board of February 28, 1916, show the following:

"Claim No. 5585. Paralysis—J. A. Bishop—Lodge 286. Insurance—$1,500. Board voted that no allowance be made on this claim."

The general secretary of the Brotherhood thereafter, on March 9, 1916, mailed a carbon copy of the action of the board of directors, from Peoria, Ill., to the secretary of plaintiff's local lodge No. 286, at Saginaw, accompanied by a letter advising that the carbon copy was self-explanatory and directing that plaintiff be notified. Steps were then taken by plaintiff, or in his behalf, appealing the matter to the general convention of the order in accordance with its constitution and by-laws. The general convention of the order met in Denver, Colo., in June of that year. William C. Lash was sent as a delegate from plaintiff's local lodge and represented him in the matter of his appeal, being authorized by his lodge to do so as evidenced by the following letter on the stationery of the Saginaw lodge, signed by its secretary:

"To the Convention—
"Mr. Wm. C. Lash—
"SAGINAW, MICH., May 28, 1916.
"*Dear Sir and Brother:*
"By a motion Saginaw Valley Lodge No. 286 has

instructed the delegate to appeal the claim of Brother Joseph A. Bishop for disability.

(Seal of Lodge)

"Yours fraternally,

"LOUIS MIKOLEIZIK,

"R. S. No. 286.

"WILLIAM C. LASH,

"Delegate 286."

The convention during its session adopted a recommendation of its committee on appeals that an allowance be made to plaintiff in the sum of $500 payable in monthly installments of $25 "on condition that he surrender his Class A certificate and accept a Class B certificate in lieu thereof."

Plaintiff within six months thereafter, on December 6, 1916, commenced this action by filing his declaration in the circuit court of Saginaw county, to which defendant pleaded the general issue with notice of the special defenses that under the constitution and by-laws of the Brotherhood the decision of its medical examiner was final and conclusive between the parties; and that the action was barred by plaintiff's failure to commence the same within the time limit provided in the contract of insurance.

Upon trial before a jury plaintiff had verdict and judgment for the full amount of his policy, and defendant asks reversal under 20 assignments of error involving in their scope the two propositions especially pleaded—that the decision of the general medical examiner was final, and the action was not begun within the time limited by contract between the parties, each of which demanded a directed verdict for defendant—and that certain errors were committed by the court in rulings upon testimony, etc., during the trial.

At the time plaintiff was injured defendant was operating under a constitution adopted in 1911, but which at the time he made his application had been

superseded by the constitution of 1914, from which we have quoted. By agreement of counsel both constitutions are in evidence for reference and argument so far as material. The constitution of 1911 does not make the general medical examiner "the sole judge" as does that of 1914. The method of making application, forms prescribed, etc., are similar under both constitutions and amongst other contentions it is urged for plaintiff that the constitution of 1911 was in force when he was injured, that his application was made under and with reference to it. Without reviewing the respective arguments and citations by counsel upon that proposition we have no doubt that under the law as settled by former decisions of this court plaintiff would as a general rule be bound by the stipulation in his policy, or certificate of insurance, that it—

"is issued upon the express conditions that the constitution of the said Brotherhood may be altered or amended at any time hereafter, * * * and that the constitution now in force, or as may be hereafter altered or amended, is and shall be a part of this contract in the same manner and to the same extent as if said constitution, or alterations or amendments thereto, were written herein."

The general rule as to stipulated tribunal is concisely stated with citation of numerous Michigan decisions in *Patrons' Mut. Fire Ins. Co.* v. *Attorney General*, 166 Mich. 438, as follows:

"The doctrine is well established in this State that members of a voluntary society may set up a tribunal to adjust the differences that arise between the association and its members, and make its decision final in the absence of bad faith or a refusal to act or to pay after an adjudication has taken place."

We do not find, however, that this court has yet gone to the extent of recognizing as a proper tribunal for that purpose a single employee of an association,

although chosen as its official medical examiner, whose functions are apparently directed to visiting or calling before him claimants and looking them over and reporting his conclusions to the secretary. It certainly would carry the doctrine beyond yet determined limits to hold that the *ipse dixit* of an interested employee, no matter what his character or official position, may be made retroactively final and conclusive against the assured, beyond any right of review before some provided official body or tribunal of the order, where opportunity is given to present proofs and be heard in a proceeding having some resemblance to a judicial inquiry, or of resort to the courts. Neither do we think that, considering the constitution of 1914 in its entirety, the provision relied upon by defendant can be so construed.

How often or to what extent this association has changed its constitution and thereby the policies or benefit certificates of its members is not disclosed beyond the fact that plaintiff's certificate, issued to him in 1908, has been subject to the provisions of at least three different constitutions, made at different times a part of his contract of insurance. His certificate as issued, and presumably the constitution then in force, recognized his right of resort to the courts by the concluding provision that—

"Any action under this certificate, either by the aforesaid member or the beneficiary designated herein, shall be absolutely barred unless such action shall be commenced in some court of competent jurisdiction, within six months from the final rejection of the claim."

The constitution of 1911 contains a similar provision and section 17 of article 12 of the 1914 constitution provides:

"All right of action upon a beneficiary certificate or the amount thereof, shall be absolutely barred unless

proof of death is made within six months from the time the beneficiary has acquired knowledge of the death of the beneficiary member, and such right of action shall also be barred at the expiration of six months from date of actual occurrence of any total or permanent disability; and it shall be likewise barred unless such action shall be commenced in some court of competent jurisdiction within six months after the final rejection of the same."

If the provision in article 5 making the Brotherhood's examiner the "sole judge" should be construed as meaning that his adverse decision is conclusive and final against claimant to the exclusion of any right of action in a court of competent jurisdiction it cannot be reconciled with the provisions of article 12 above quoted, which is the last utterance and negatives or modifies the former.

Defendant's constitution is a lengthy and cumbersome document containing numerous numbered articles divided into many numbered sections again often subdivided into alphabetically marked subsections or paragraphs, sometimes inharmonious and difficult to reconcile. Although subdivision (f) of section 7, article 5, makes the medical examiner the sole judge of whether a disabled claimant is entitled to the amount of his certificate in accordance with the constitution and by-laws of the Brotherhood, section 1 of article 13 provided that his rejected claims shall be referred by the general secretary to the board of directors and—

"If the board, after thorough investigation, believe the claim is worthy of charitable consideration of the organization, the payment of a sum not in excess of the full amount of beneficiary certificate may be authorized."

And by subdivision (c) of said section—

"Any member whose claim has been rejected by the board of directors will have the right of appeal to the convention, or may appeal to the board from

time to time when in session, upon condition that he present additional evidence."

Plaintiff with the assistance of his local lodge pursued these prescribed remedies until they were exhausted, claiming a legal right to the amount of his policy according to its terms, and within less than six months after final rejection of his claim commenced this action in a court of competent jurisdiction. Not only had the board of directors authority under their constitution to award plaintiff the full amount of his beneficiary certificate, after the medical examiner had refused to do so, but on appeal the convention could do likewise, and the possibility of an amicable adjustment within the order was not reached as a finality until it had refused to do so.

Construed as defendant contends for, the proceedings provided in its constitution relative to claims of beneficiaries are palpably more arbitrary and unfair to a claimant than those pronounced "very arbitrary and unusual" in *Rose* v. *Order of Patricians*, 126 Mich. 577. It was there said to be incumbent upon the officers to strictly pursue the method provided for considering claims, and held that an authorized appeal to a designated body of that order, called its supreme court, meant that appellant was entitled to a hearing in the nature of a judicial proceeding by and before that body, not by a committee on appeals upon whose report it had acted; that by the course pursued plaintiff was "deprived of the hearing to which he was entitled, and therefore he may maintain his suit at law to enforce his claim." In this case plaintiff, as authorized by the constitution, appealed to the convention of the order, which simply referred the matter to a committee and later adopted its report.

As to the limit of time within which action may be brought, defendant contends that it begins to run from the time of the medical examiner's rejection of

plaintiff's claim which was a final adjudication within the order of all his legal rights, since the medical examiner was the "sole judge" of whether he was entitled to compensation in accordance with the constitution, and that the various provisions for appeal to which we have referred gave plaintiff's claim no legal standing before the order because they appear under the heading "benevolent department," and his provided right of appeal should for that reason be construed as meaning, in substance, but permission for him to appeal to the benevolent sentiments of the Brotherhood as a suppliant asking charitable consideration of his case, founded on no legal claim of right by reason of his contract of insurance.

If such was the intended meaning of those portions of the constitution relating to appeal, that which could be concisely expressed in a few plain words is so obscured by detailed provisions and elaborate phraseology as to readily mislead and lure a claimant into following in good faith the prescribed proceedings for appeal within the order until his right of resort to the courts was unwittingly lost. A construction by doubtful inference in favor of those who prepared the contract of insurance is not to be given in abridgement of such right.

Considering defendant's constitution in its entirety, we are well satisfied that it did not make the decision of the examining physician who rejected plaintiff's claim final and conclusive against review. It gave both the board of directors and the convention of the order full power to allow in full or reject it in case he took the prescribed appeal, which he did. His claim as made suffered final rejection by the convention within six months of the time this action was begun. The claimed inference from the heading "benevolent department" can have no application to section 17 which under the separate heading "limitation

of action of beneficiaries" expressly provides, without any qualification as to why or how the rejection occurred, that claims for permanent or total disability shall be barred unless the action is commenced "within six months after final rejection of the same." Plaintiff's action was begun within the time limit provided in the contract between the parties.

The verdict of the jury is well sustained by ample evidence. Plaintiff had worked as a railroad man for 28 years. For 17 years prior to this accident which terminated his service he was in the employ of the Pere Marquette Railroad Co., in good health, working steadily, with no ailments requiring the service of a physician. As he recovered from the immediately severe injuries of his accident it was found that a paralytic condition had resulted, manifested by lack of control and inability to co-ordinate his lower limbs which so impaired his power of movement that he could walk but little and with difficulty, assisted by a cane, and was thereafter unable to resume his former calling or engage in any other physical employment. He was for a long time under the care of his local physician and at times consulted and was examined by other medical men of repute, amongst other things trying osteopathic treatment. Dr. J. M. Wilson, who was called to treat him at the time of the accident and visited him professionally every day for two months thereafter, having last examined him the evening before being called as a witness, gave the history of his case from personal knowledge, and testified to injuries at the base of the spine, resulting in his opinion in a disabling degree of paralysis of the legs which he regarded as permanent. Dr. H. R. Wilson, the local examining physician of defendant Brotherhood at Saginaw, who examined plaintiff shortly after the accident, stated he had knowledge of his condition from the time he was injured until the trial and testified

that in his examinations he found a depression of plaintiff's spinal cord resulting from displacement of the first lumbar vertebræ causing paralysis of the lower limbs with wasting of the muscles; that between an examination made in May, 1915, and one the day before testifying he discovered no material difference in the paralysis, which in his opinion would prove permanent. Dr. Inglis, a prominent specialist on mental and nervous diseases, and other physicians who had examined plaintiff, gave expert testimony to the same effect, describing plaintiff's trouble as sensatory and motor paralysis of the lower extremities. Without further details, it may be stated that there was ample testimony which, if believed, fully sustained plaintiff's claim of total incapacity to perform manual labor, by reason of permanent paralysis of his lower extremities. The only professional witness called by defendant to the contrary was Dr. Cory, its general medical examiner, who gave his conclusions from the one interview with plaintiff, and adhered to his then declared theory that he was "a simulator of an exaggerated type."

It is contended under various objections which were interposed during the trial that much of plaintiff's medical testimony was erroneously admitted, because the evidence should have been restricted to his condition at the time he was examined by the general medical examiner, on June 26, 1915. Plaintiff's claim was that he had been stricken with disabling permanent paralysis at the time of his application to the order for compensation according to the terms of the policy, necessarily continuing if permanent, which defendant denied, until the time of the trial, including of course the day upon which he was examined by Dr. Cory and all intervening days. The court distinctly told the jury that the issue for their determination was "whether the plaintiff at the time he presented his application

was afflicted with permanent paralysis of either extremity" and for him to recover the jury must find "that he was permanently paralyzed below the knee to such an extent that he will be permanently disabled and incapacitated from performing all manual labor on account thereof." We think the issue was well guarded and fairly submitted to the jury, and, without deeming it important to discuss in detail the further assignments of error directed to admission of evidence and the charge of the court, conclude that no prejudicial or material error is shown which indicates a miscarriage of justice resulted.

The judgment is affirmed.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred. OSTRANDER, J., did not sit.